TATE, Judge
(dissenting).
Fully acknowledging the conscientiousness of his brethren herein in their reversal of the District Court’s award in favor of the widow and children of McCraine, duty likewise compels the writer to dissent from their decree.
The well-written majority opinion gives plausible reasons why the accident may have been proximately caused by the fault of the decedent, McCraine. But an appellate court cannot base its judgments on speculation; nor perform its duties in a vacuum untainted by findings in the trial proceedings and unregulated by legal rules and principles pertaining to the burden of proof and presumptions.
Plank Road had been enlarged from two to four lanes, as the majority opinion indicates, at every place except at the crossing of Monte Sano Bayou, where the fatal accident occurred. There, the eastern (northbound) two lanes passed over the old bridge; the western (southbound) two lanes, upon which McCraine was travelling at the time of his sudden death, was abruptly interrupted by a crevasse so large (about as deep as a two-story building is high) that early morning traffic and defendant’s morning workers could not see the wrecked car in the bottom where it had fallen and killed McCraine.
As this court recently stated in Smith v. Department of Highways, 87 So.2d 380, at page 383, the warning to the public of hazards on the public highways “should be of a size and nature commensurate with the danger ahead.” As the very able District Court pointed out, in effect the bridge was out on the southbound highway lanes; it was passable only with extreme danger to life; a most hazardous death-trap had been created by defendant contractor, which called for more than a merely routine “sawhorse” or A-frame barricade, presenting but six inches of striped surface to oncoming traffic, without signs or additional warnings to alert the oncoming traffic to the great peril ahead in these lanes, or without any effort whatsoever made to check that the flares, blithely lit and left at eve, still burned throughout the night. See Reeves v. State, La.App. 2 Cir., 80 So.2d 206, pointing out the need in such circumstances for a com- *171 píete barricade properly lighted, and for alerting barricades, warning, and detour signs at appropriate and safe distances from the hazard.
At the risk of reiteration, the sole warning furnished the public was a saw-horse type of barricade, three 2-inch by 6-inch planks spread across two A:frames, only' one of which planks was turned with its six-inch striped surface to the oncoming traffic, upon the other two of which planks laying flat ten flares had been left approximately ten hours before the accident. No attempt whatsoever had been made during the entire night to see that these flares remained lit and that the flimsy barricade' still s^ood.
The District Court believed, correctly in my opinion, that the flares and planks so flimsily guarding the death-trap athwart the ■ highway had been knocked away by earlier traffic prior to McCraine’s fatal plunge. In the absence of any eyewitness to this fact or to the accident, it is of course of great importance as to which party had the burden of proving whether the flares were lit at the time of the accident.
With extremely great ability and cleverness, counsel for defendants-appellants urges that the flimsy barricade and unchecked flares [1] provided adequate warning to normal traffic approaching along the southbound lanes. The importance of this maneuver is that if defendants can avoid a finding that the contractor was primarily negligent in not providing further warning of the death-trap, then in effect the burden might be upon those standing in the shoes of the dead McCraine to prove that the flares were not lit at the time of the accident; whereas otherwise, defendants-appellants would have the burden of proving-McCraine was contributorily negligent in not seeing any such flares across his path so as to defeat his recovery.
The success of this clever maneuver with the majority herein puts the burden upon plaintiffs to prove their decedent was free of contributory negligence, in defiance of' all the jurisprudence concerning burdens • of proof and presumptions.
Such an argument that sufficient warnings were provided of this ultra-hazardous trap across a main highway not only flouts com,-mon sense: the uncontradicted expert testimony in the record, that of an impartial safety expert in the employ of the City of Baton Rouge, is to the effect that such a dangerous situation requires several “pre-warnings”, a more brightly lit and substantial barricade, and signs indicating the great hazard ahead. This is in line with the jurisprudence, see, e. g., the Reeves case.
In my opinion, these uninspected flares, set out ten hours before and on the very brink[2] of the death-hole, furnished almost as inadequate a notice to night traffic as would have an advertisement in the morning paper, which the normal general traffic using the highway might or might not have *172 read and might or might not have been suf-ficienty alerted thereby so as to take the extra precautions necessitated by the extraordinarily hazardous situation created by defendants across the public highway.
It is noteworthy that defendants-appellants did not produce any expert testimony in support of their theory that sufficient safeguards were provided the travelling public [3], to contradict the expert testimony introduced by plaintiffs. Like the Scholas-tics of the Middle Ages, who used to calculate to the tenth of a wing the number of angels able to dance upon the head of a pin, defendants instead prefer to rely upon pure reason and native logic proceeding from intuitive assumptions and suppositions, rather than upon facts or evidence in support of this theory.
But the test of adequate safeguards is not simply to be imagined out of the thin air in the peace and quiet of a law library by what might be visible to the naked eye (if still lit and standing) looking for the warning, seen from the perspective of an appellate court record in the aftermath of a tragic accident. It is what, at the time and place of the accident, is sufficient to alert a reasonably prudent motorist, proceeding with ordinary care, to the hazard in his path. I cannot believe that the contractor’s duty to the travelling public on this main highway was satisfied by resting a plank of six-inch striped surface about five feet off the ground across two A-frames, and by lighting and leaving ten flares (amidst a row of distracting flares along the side of the road) hours before the accident, without checking to see they remained lit, and without further warnings or pre-warnings of the extraordinary hazard; when a motorist’s failure to perceive the plank and flares, either because of carelessness or because the flares had gone out or had been displaced by prior traffic, resulted not in property damage and slight danger to the person but in almost certain death. My disbelief is fortified by the uncontradicted expert testimony in the record, and by the prior jurisprudence.
I think unquestionably the contractor was grossly negligent in not providing further warning to the public (and in fact on the nights following the accident pre-warning signs and additional barricades were supplied), not of course because of murderous instincts — although the result was the same — , but simply because from not unusual human carelessness the, contractor’s employees became blind to the hazard which developed when they completed the lanes of the highway open to traffic right up to what before had just been a deep gully off the side of the road.
The primary negligence of the contractor being a proximate cause of the accident, the burden is upon it and its codefendant insurer to prove that any contributory negligence of the plaintiffs’ decedent constituted a contributory proximate cause of the accident so as to defeat recovery. While McCraine’s widow and orphaned infants cannot have the benefit of his testimony to prove incorrect the suppositions concerning his allegedly negligent conduct, as the Supreme Court stated in reversing us recently, “where there are no eyewitnesses to any act of negligence it is presumed that! the decedent acted with ordinary care”, Stansbury v. Mayor, etc., of Morgan City, 228 La. 880, 84 So.2d 445, 448.
In Dowden v. State, La.App., 81 So.2d 48, likewise concerning injuries caused where a bridge was out across the trav-elled portion of a highway, disposing of the plea of contributory negligence and allowing recovery the Second Circuit through Judge Ayres reiterated, 81 So.2d 53:
“ ‘The general rule is also well established and recognized in the jurisprudence of this state that a motorist *173 using a public highway has a right to presume and to act upon the presumption that the highway is safe for the usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments or obstructions to which his attention has not been directed.’ ”
Assuming that the decedent might have been contributorily negligent had he failed to perceive the flares properly lit and still standing in his path (despite the distracting side-flares and the lack of other signs or warning), we find that without exception the witnesses testifying as to the particular flares in question either spoke of them as correctly located several hours before the accident, or frankly admitted that after the accident they saw flares from their porches or windows but did not know whether or not the flares they saw were the innocuous side-flares along the shoulder of the road rather than the warning flares in question.
Further, the witnesses who were awake or awakened when the “thud” or loud plop sounded at about four A.M., which is found to be the noise caused at the time of McCraine’s accident, uniformly heard only the single sound of the thud or plop, and did not hear any additional noise of a crash scattering barricade and flares all over the road, where they were found the following morning, and such as might reasonably have been expected had McCraine himself run through the barricade and then thudded into the deep hole.[3]
In view of such testimony, it seems to me that the most reasonable inference of the complete lack of skidmarks made by Mc-Craine’s automobile is not such gross lack of lookout as to plainly lit flares squarely across-his path, but rather the lack of the warning flares (taking into account normal reaction time; see footnote 2 in dissent above).
A supposition of such gross lack of lookout on the part of the decedent ignores the legal presumption in favor of his ordinary care, see Stansbury case, above-cited. And in any event, such factual testimony far from meets the burden upon defendants-ap-lants of proving the contributory negligence of the decedent by a preponderance of the evidence. In this regard, it seems to me insufficient and unimpressive are the following arguments:
(1) The weight attempted to be attached to deductions from Mrs. Merrill’s hearing a board slapping on the road after four A.M., but not before, seems to me to be worthy of the efforts of Sherlock Holmes in solving by pure deduction the mystery of a detective novel, but to be completely unsatisfactory as a means of satisfying the burden of proving decedent’s contributory negligence; and not only because of the preponderant other testimony in the record, including that directly deduced fro-m Mrs. Merrill herself. To belabor the obvious, such testimony simply indicates only that Mrs. Merrill heard the board when she was awake after four A.M. and not that it did not flap before that time when she was asleep, so far as the record indicates. Or McCraine or other traffic might have pushed a portion of the already fallen barricade or the construction lumber scattered behind the barricade into the path of subsequent traffic, without McCraine himself having knocked down the barricade.
*174 (2) Likewise, the significance attempted to be attached to the fact that McCraine’s car ran ‘over a mound of dirt 3-4' high in order to fall into the Monte Sano Bayou gulch must be evaluated with reference to the evidence and photographs showing that ‘ the car ran up and over the dirt mound, unchecked, rather than plunged through it.
(3) The argument that McCraine should have been alerted to the danger because he had ridden as a passenger in Johnson’s car over the same route several hours earlier is unrealistic, not only because of the slight duty upon and slight natural tendency of a passenger to observe the road closely when another' is' driving, *but also because going they crossed Monte Sano Bayou on the old' bridge, unimpeded by the crevasse into which decedent fell returning. The flares lit, along the side of the road simply indicated that there was some danger in going upon the shoulders thereof, not that the construction job included the creation of a death-trap across his path, inadequately lighted and guarded, and with no warning signs.
It is a matter of regret to the writer that this dissent must be so long in its effort to show in their proper perspective within the entire picture displayed by the evidence as whole the tidbits of evidence, snipped here and there, upon which defendants-appellants so ably rely. The allocation in a lawsuit of blame, if any, for the death of a fellow human being is not simply an intellectual exercise, but a heavy duty entrusted to the judiciary. Just as we must not let sympathy for the unfortunately bereaved sway us from such duty, neither must we shrink from the duty of affirming the necessarily heavy award which must be made should we decide in favor of this young widow and these four young children who were in one moment bereft of the love and counsel of a tender father, who lost in that single instant the shelter and shield afforded by a good provider against the storms of insecurity and the ravening beasts of financial distress.
I think the District Court’s judgment, far from being manifestly erroneous, should be affirmed as impregnated with wisdom and as unassailable logically, correctly applying the burdens of proof, presumptions, and legal precedents which should govern all Louisiana courts. So feeling, I must respectfully dissent from the majority opinion of my esteemed brethren.
Rehearing denied; TATE, J., dissenting.

. The sufficiency of which flares to alert the oncoming motorist must be visualized in their setting as a few among many flares set along the edge of the highway, the latter being routine warnings of the relatively slight hazard of the soft shoulders or raised pavement of an almost-completed new highway.

. The pavement ended 69' before the hole, the warning plank being set supposedly 6-10' before the end of the pavement. At the legal speed of 35 mph (51.1' per second), this was less than 1 y2 seconds from the edge of the hole; or in other words, if down or so as not to alert the motorist before an impact, within the normal limits of reaction time, so that the motorist would be in the hole before he “reacted” or realized he was off the pavement end or had hit any barricade. This of course furnishes a logical explanation why McCraine’s car made no skidmarks, thus indicating that the brakes were not applied before his car hurtled into the gully. (The Louisiana Driver’s Guide, found in the record, indicates that normal reaction time varies between %-l% seconds; the Safety Service Company chart (1955) indicates- that normal reaction times of various individuals or of the same individual at various times vary between % and 2 seconds.)

. Such as, for instance, their safety expert permanently retained to advise them on such matters, who was according to the record available in and near the court to testify.

. For instance Mrs. Merrill, upon whose testimony defendants-appellants rely so heavily, testified upon cross-examination at Tr.-174:
“Q. And you said you heard one noise like a thud or a stone dropping in the water, but it wasn’t a crash? A. No, if there had been a crash I suppose I would have investigated it, being curious as women usually are.”
Cf., testimony of Mr. Scott, her roomer, Tr-179:
“Q. And you say this sound you heard was sort of a thud, that it didn’t sound like anything to get alarmed about? A. That’s right, no wreck, didn’t sound like a wreck to me.”